**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

AUG 11 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ROLANDO ALBERTO CALDERON, <br><br> Petitioner, <br><br> v. <br><br> TODD BLANCHE, Attorney General, <br><br> Respondent. | No. 25-6153 <br><br> Agency No. <br> A072-525-736 <br><br> MEMORANDUM* |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 5, 2026
Pasadena, California

Before: GRABER, KOH, and H.A. THOMAS, Circuit Judges.

Petitioner Rolando Alberto Calderon, a native and citizen of El Salvador, is a

former member of the gang Mara Salvatrucha ("MS-13') who still bears an MS-13

tattoo. Petitioner seeks review of the Board of Immigration Appeals' ("BIA")

denial of his motion to reopen proceedings to assert a claim under the Convention

Against Torture ("CAT"). Petitioner asserts, and the agency agrees, that his motion

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

to reopen is not time-barred because it presents material evidence of changed conditions in El Salvador.  See 8 U.S.C. § 1229a(c)(7)(C)(ii) (providing no time limit for a motion to reopen an application for asylum or withholding of removal if the motion is based on material, previously unavailable evidence of "changed country conditions"); 8 C.F.R. § 1003.2(c)(3)(ii) (same); see also Go v. Holder, 744 F.3d 604, 609 (9th Cir. 2014) (holding that the procedures of 8 C.F.R. § 1003.2(c) "apply to CAT claims").  Petitioner fears that he will be tortured if returned to El Salvador due to the "State of Exception," a program that the Salvadoran government started in March of 2022 to combat gangs.  Specifically, he fears that he will be detained and that he will be tortured while in prison, by both government officials and gang members.  We review the denial of a motion to reopen for abuse of discretion.  Go, 744 F.3d at 609.  We grant the petition, vacate the BIA's decision, and remand.

The immigration judge ("IJ") ruled that Petitioner made a prima facie showing that he likely will be imprisoned in El Salvador, in part because of his large, gang-related tattoo and his criminal history, but that he failed to make a prima facie showing that he likely will be tortured in prison.  The IJ reasoned, first, that "detainees are subjected to squalid prison conditions due to overcrowding," which does not constitute torture unless there is evidence of the actor's intent to cause harm.  The IJ described prison conditions as already harsh and life-

2

threatening before the State of Exception, due to gross overcrowding.[1]  Second, the

IJ reasoned that the government of El Salvador "is detaining people for a legitimate

purpose—preventing rampant gang violence."  Third, the IJ stated that only "[a]

very small fraction of prisoners detained during the State of Exception have

suffered intentional harm that could amount to torture" because only some of the

241 reported in-custody deaths in a population of approximately 80,000

Salvadorans imprisoned under the State of Exception were violent deaths that

resulted from torture.  Finally, the IJ asserted that because Petitioner is a former

(not current) gang member, he "could be released upon proving he is no longer

associated with MS-13."

The BIA dismissed Petitioner's appeal.  The BIA concluded that the IJ

applied the right legal standard, found no clear error in the IJ's factual findings,

and affirmed the decision that Petitioner "did not establish a reasonable likelihood

that he could establish eligibility for deferral of removal under the CAT if these

proceedings were reopened."  In sum, the agency denied Petitioner's motion solely

because he failed to establish prima facie eligibility for CAT relief.  See

Najmabadi v. Holder, 597 F.3d 983, 986 (9th Cir. 2010) (describing the reasons for

---

[1] Contrary to the agency's assertion, the State of Exception significantly increased
overcrowding.  Before the State of Exception, prisons were at 109% capacity.  In
January 2023 (less than a year into the State of Exception), overcrowding peaked
at 300% capacity.  Amnesty International, Behind the Veil of Popularity:
Repression and Regression of Human Rights in El Salvador 30 (2023).

3

which the agency may deny a motion to reopen).  Therefore, our review is limited to that ground.  See Lemus-Escobar v. Bondi, 158 F.4th 944, 969 (9th Cir. 2025) (reviewing "only the reasons given by the BIA" for denying a motion to reopen).

"[P]rima facie eligibility for relief requires only a threshold showing of eligibility—a reasonable likelihood that the petitioner would prevail on the merits if the motion to reopen were granted."  Fonseca-Fonseca v. Garland, 76 F.4th 1176, 1179 (9th Cir. 2023).  On a motion to reopen, Petitioner need not "proffer evidence that proves [his] claim for relief."  Id. at 1181.  Rather, he need only "satisfy [the agency] that it would be worthwhile to develop the issues further at a plenary hearing on reopening."  Ordonez v. INS, 345 F.3d 777, 785 (9th Cir. 2003) (quoting In re S-V-, 22 I. & N. Dec. 1306, 1308 (BIA 2000)).  With the exception of discounting "inherently unbelievable" affidavits, the agency "may not make credibility determinations" or resolve conflicts in the evidence at this stage.  Silva v. Garland, 993 F.3d 705, 718 (9th Cir. 2021) (citation omitted), abrogated on other grounds by Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024); see also Sarkar v. Garland, 39 F.4th 611, 622 (9th Cir. 2022) (explaining that, to make a prima facie case, a petitioner "must adduce evidence that . . . will support the desired finding if evidence to the contrary is disregarded" (citation omitted)).

The agency correctly applied the "reasonable likelihood" standard.  But the agency abused its discretion by determining that Petitioner failed to establish prima

4

facie eligibility for CAT relief.  See Lemus-Escobar, 158 F.4th at 968–69

(reviewing such a determination for abuse of discretion)  The agency already found

that Petitioner established a prima facie case that he would be imprisoned if

returned to El Salvador.  And contrary to the agency's determination, "under any

reasonable consideration of the record at the motion-to-reopen stage," id. at 969,

Petitioner established a reasonable likelihood that, upon further development of the

record, he can demonstrate that he is more likely than not to be tortured in prison

by, or with the acquiescence of, government officials.  See 8 C.F.R.

§§ 1208.16(c)(2), 1208.18(a)(1) (defining eligibility for CAT relief).  The agency

erred in two major respects.

First, the legitimacy of a person's imprisonment is irrelevant to the

commission of torture after that person is imprisoned.  See id. § 1208.18(a)(3)

(excluding lawful sanctions from the definition of torture but including "sanctions

that defeat the object and purpose of the Convention Against Torture to prohibit

torture"); id. § 1208.18(a)(5) ("In order to constitute torture, an act must be

specifically intended to inflict severe physical or mental pain or suffering.").

Second, Petitioner established a prima facie case in light of the record

evidence of conditions in Salvadoran prisons and his asserted particularized risks.[2]

---

[2] All reports and articles cited in this disposition are in the administrative record
and were before the agency.

In a December 2023 report, Amnesty International stated that "[e]veryone interviewed by Amnesty International who was imprisoned" under the State of Exception "affirms that torture and cruel, inhuman, and degrading treatment have become habitual practice rather than isolated incidents in the prisons." Behind the Veil of Popularity 34 (emphases added). Guards "beat detainees to get them to 'confess' to being members of a gang structure" and sometimes "for no apparent reason beyond the purpose of inflicting pain or suffering." Id. Prisoners "report mistreatment consisting of physical and verbal abuse, disproportionate use of pepper spray, and severe restrictions on basic aspects of daily life such as food, water and using the toilet, as well as a lack of access to open-air spaces." Id. "These descriptions line up with the public statements from top authorities at the General Directorate of Penal Centres, who suggest a policy of systematically torturing everyone who is detained under the state of emergency because they are suspected of being gang members." Id. at 34 (emphasis added). Amnesty International concluded that the "Salvadoran state has adopted a policy of systematic torture of all persons detained under the state of emergency because they are suspected gang members." Id. at 77 (emphasis added). The IJ, by focusing almost exclusively on deaths, overlooked this evidence of pervasive, systematic beatings and other severe inhumane mistreatment.

6

Other reports are similar. Cristosal, El Salvador's primary human rights organization, reported that "some of the few people released from prisons—mostly minors—have shown signs of being beaten, starved, and medically neglected. Some have shown signs of torture." Ryan Devereaux & John Washington, <u>After Being Deported by U.S., Walter Cruz-Zavala Disappeared in Notorious Salvadoran Crackdown</u>, The Intercept (Sep. 20, 2022), https://theintercept.com/2022/09/20/walter-cruz-zavala-el-salvador-state-of-exception/ [https://perma.cc/45B2-ZA86]. The Department of State's 2023 Human Rights Report for El Salvador states that "a coalition of human rights organizations . . . interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks." U.S. Dep't of State, <u>El Salvador 2023 Human Rights Report</u>, 37 (2023). A BBC reporter described that, in CECOT (a newly opened prison), "the artificial lights are never turned off" and prisoners sleep on "bare metal." Leire Ventas, <u>Coming face to face with inmates in El Salvador's mega-jail</u>, BBC News Mundo (Feb. 14, 2024), https://www.bbc.com/news/world-latin-america-68244963, [https://perma.cc/28QE-3XTU]. Detainees released from other prisons reported "severe heat and lack of ventilation," <u>El Salvador 2023 Human Rights Report</u> at 40, and "a lack of food and potable water," <u>Id.</u> at 39. "[I]n some cases, during an entire day, they are only allowed to drink a

cup of water." Bryan Avelar, <u>Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons</u>, El País (May 29, 2023), https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html [https://perma.cc/M3J8-VGB2]. Even if some of those conditions might not alone constitute torture, in combination they may rise to the level of torture if the requisite governmental intent is shown. <u>See</u> <u>Cole v. Holder</u>, 659 F.3d 762, 774 (9th Cir. 2011) (recognizing "that the <u>intentional</u> denial of medical care as a form of punishment could suffice to establish a CAT claim").

Importantly, the record reflects that those conditions and mistreatment <u>are intended</u> to cause pain and suffering. A month after the beginning of the State of Exception, President Bukele "threatened to withhold meals for inmates, saying: 'I don't care what the international organisations say.'" Anna-Cat Brigida, <u>Dozens die in custody under El Salvador's state of exception</u>, Al Jazeera (June 21, 2022), https://www.aljazeera.com/news/2022/6/21/dozens-die-in-custody-under-el-salvadors-state-of-exception [https://perma.cc/JLF3-TUQX]. Amnesty International concluded that torture and death in custody "are not isolated cases. They are the product of a high degree of state coordination and occur with the knowledge of the highest authorities, who

8

often incentivize and justify them." <u>Behind the Veil of Popularity</u> at 76.  El Faro

reported that:

> Since the state of exception began, the government's propaganda machine has churned out an endless stream of images <u>celebrating the subjugation of alleged criminals</u>:  in the first weeks, the police even <u>disseminated videos depicting the torture of people in their custody</u>— men in handcuffs, faces smashed against the pavement, boots pressing down on their necks.
>
> In late February of [2023], the Bukele administration again resorted to a classic iron-fisted optic that it has used since 2020:  Images of hundreds of tattooed prisoners, sitting, semi-naked, pressed against each other like sardines and surrounded by riot police.

Gabriel Labrador & Óscar Martínez, <u>One Year under a Police State in El Salvador</u>,

El Faro (Mar. 31, 2023), https://elfaro.net/en/202303/el_salvador/26793/one-year-

under-a-police-state-in-el-salvador [permalink unavailable] (emphases added).

Accordingly, the agency erred not only by finding that "detaining people for a

legitimate purpose" precludes torture, but also by failing to give reasoned

consideration to the evidence of the government's intent to torture.

Additionally, the record includes evidence that gang members in prison

inflict harm on other detainees with the prison's acquiescence.  "Amnesty

[International] has . . . documented a pattern of prison violence, perpetrated by

both gangs and authorities."  Brigida, <u>Dozens die in custody under El Salvador's</u>

<u>state of exception</u> (emphasis omitted).  "[G]ang members are in control of

prisons."  <u>Id.</u>

Finally, the agency suggested that Petitioner is less likely to be tortured because he "could be released upon proving he is no longer associated with MS-13." The agency erred to the extent that it considered countervailing evidence of Petitioner's likelihood of being released. See Sarkar, 39 F.4th at 622 (stating that, to determine whether a petitioner has made a prima facie case, the agency disregards "evidence to the contrary" (citation omitted)). Moreover, on this record it is highly unlikely that Petitioner could avoid harm by being released after proving that he is no longer a gang member. Of the approximately 80,000 people detained, only about 7,000 had been released as of April 2024. Marcos Alemán, At least 241 people have died in El Salvador's prisons during the 'war on gangs,' rights group says, AP News (Apr. 3, 2024), https://apnews.com/article/president-nayib-bukele-war-on-gangs-human-rights-el-salvador-d90fbd45833291f09efb2c962dea605d [https://perma.cc/X86Z-L4AY]. Petitioner would have added difficulty securing his release due to his MS-13 tattoo.

For the purpose of a motion to reopen, Petitioner's evidence is sufficiently particularized. The evidence concerns how detainees under the State of Exception are treated, and the agency found that Petitioner is likely to be detained. Furthermore, Petitioner fears harm by gang members in prison due to his status as a former gang member with visible signs of his prior gang affiliation. Indeed, since Petitioner left MS-13, he has faced threats of harm from active MS-13

members.  That asserted risk does not apply to all detainees under the State of Exception.

Accordingly, Petitioner's evidence amounts to a prima facie case, and the agency abused its discretion by determining otherwise.  See Lemus-Escobar, 158 F.4th at 969 (holding that the BIA abused its discretion by determining that a petitioner failed to establish a prima facie case of eligibility for CAT relief where the petitioner presented "detailed reports of significant mistreatment at the sole public mental health hospital in the country, including violence and torture caused by those with an intent to harm," which substantiated the petitioner's fear that he would be institutionalized and experience similar abuse and torture).  Because this is the sole reason on which the agency relied to deny Petitioner's motion to reopen, on remand the agency must reconsider the motion to reopen.

**PETITION GRANTED; BIA'S DECISION VACATED; REMANDED for further proceedings consistent with this disposition.[3]**

---

[3] Petitioner's motion to stay removal and supplemental motion to stay removal, Dkt. Nos. 2 and 9, are granted.